IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JUANNISE LAMAR HILL, | ) | |
| | ) | |
| *Petitioner,* | ) | |
| | ) | |
| v. | ) | CASE NO.   2:00-cv-00491-TMH |
| | ) | [criminal case no. 97-013] |
| | ) | |
| UNITED STATES OF AMERICA, | ) | WO |
| | ) | |
| *Respondent* | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

This 28 U.S.C. § 2255 motion, as amended (Docs. 375, 397), and the consolidated

*Motion for Relief from Judgment Pursuant to F.R.C.P. 60(b)(6)* (Doc. 384) have been submitted

on the pleadings, written submissions, and an evidentiary hearing.   After due consideration,

including scrutiny of the trial transcript, the Magistrate Judge concludes that  no relief is

warranted.

## I.   PROCEDURAL HISTORY

### A.   Trial Proceedings

An indictment filed January  2, 1997, named the Petitioner,  Juannise Lamar Hill

("Hill"), as a co-conspirator with Haywood Norman ("Norman"), Terri Herston ("Herston"),

Kewanee  Richardson  ("Richardson"),  Betty  Knight  ("Knight"),  and  Myron  Williams

("Williams"), in narcotics offenses described, in material part,  as follows:

### Count I

continuing to and including the 4th day of December, 1996, in Montgomery ... the

defendants did knowingly and intentionally combine, conspire, confederate and agree together with each other and others both known and unknown to the Grand Jury, to knowingly and intentionally possess with intent to distribute and distribute cocaine base, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846.

### Count II

On or about the 4th day of December, 1996, at the Capitol Inn Motel, In Montgomery, within the Middle District of Alabama, the defendants, aiding and abetting one another, did knowingly and intentionally possess with intent to distribute cocaine base, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.[1]

John William Focke, II, the assistant Federal Defender appointed initially after Hill's arrest on the criminal complaint filed December 4, 1996, provided representation at Hill's preliminary and detention hearings, arraignment, and the jury trial, before Senior United States District Judge Truman M. Hobbs (Docs. 39, 45, 77, 219-220).

Jury selection proceeded on July 7, 1997, for the joint trial scheduled to commence the next day for co-defendants Hill, Knight, and Williams (Doc. 219).[2] On the first day of

---

[1]A third count charged that Norman and Richardson aided and abetted each other in possessing cocaine with intent to distribute on December 4, 1996, at 2939 Riviera Road, in Montgomery. (Doc. 64).

[2]Co-defendant Herston filed notice on February 24, 1997, of her intent to plead guilty (Doc. 132), and pursuant to a plea agreement, on May 9, 1997 she plead guilty to the second count of the Indictment and U.S. District Judge Ira DeMent granted the United States' motion to dismiss the first count. (Doc. 179). Co-defendants Richardson and Norman secured continuances of their trials (Docs. 182-184), and on July 3, 1997, the court granted the United States' motion to dismiss the Indictment against Richardson. (Doc. 214). On August 1, 1997, the court declared Norman incompetent to stand trial and ordered him committed for psychiatric evaluation (Docs. 233, 244); he did not prevail on his subsequent motion to dismiss the Indictment (Docs. 294, 303,304), but following supplemental competency hearings, the court released him conditionally and dismissed the indictment. (Docs. 376, 377).

trial, after opening statements and testimony by Montgomery Police Det. Vanessa Davis and co-defendant Terri Herston as witnesses for the government, the court convened counsel in chambers to report  Knight's "desire[] to enter a plea of guilty and cooperate with the government by testifying" adversely to Hill and Williams, both of whom moved unsuccessfully for a mistrial. The court did allow a continuance of trial until the following morning and, pursuant to defense counsel's stated preferences, provided no explanation to the jury about her plea.[3]

The jury returned a guilty verdict against Hill on July 9, 1997, as to both counts indicted. (Docs. 223, 226).  Denied acquittal by the court (Docs. 219 and 223), Hill filed on August 11, 1997, a *pro se* Notice of Appeal to the U.S. Court of Appeals for the Eleventh Circuit.  On September 18, 1997, Susan G. James noticed her appearance as Hill's  retained counsel "for purpose of sentencing and appeal",  prompting Assistant Federal Defender Focke's successful motion to withdraw. (Doc. 250-251)

Judge Hobbs sentenced Hill on November 6, 1997 to  imprisonment terms of 97 months  on each count,  to be served concurrently, followed by  5 year-terms  of supervised release   on each count, also to run concurrently; and a special assessment  fee  totaling $200.00. The court also  recommended that Hill be designated  to a facility where drug counseling is available (Doc. 271).  In a  *Notice of Correction of Sentence Pursuant to Rule 35(c), Federal Rules of Criminal Procedure* filed the next day, the United States Attorney

---

[3]Doc. 219, Trial Transcript (" Trial Tr."), vol.1, 112-119.

3

advised:

> During the sentencing hearing, the court found that the defendant was responsible for an amount of crack cocaine in the 50-150 gram range for Sentencing Guidelines purposes.
>
> Approximately one hour following the sentencing, the United States realized that the Court's findings as to the quantity of crack cocaine attributable to the defendant raised the defendant's statutory minimum sentence to not less than 10 years, nor more than life, pursuant to 21 U.S.C. § 841(b)(1)(A)(iii), (viii). Therefore, the 97 month sentence imposed by the Court was less than the statutory minimum of 10 years.

(Doc. 272).

The Amended Judgment filed November 18, 1997 reflected Judge Hobbs' re-sentencing on November 13, 1997, in compliance with the sentencing guidelines: concurrent prison terms of 120 months followed by concurrent terms of supervised release for five years. (Doc. 278).  Defense counsel James noticed appeal for Hill on November 14, 1997, from his convictions and sentences. (Doc. 277).[4]

   **B.  Direct Appeal**

On appeal, Hills argued

> that his conviction for conspiracy must be reversed because the evidence was not sufficient to show that he was a member of the conspiracy. . . . that both convictions must be reversed because the district court erred in not suppressing the testimony of two of the government's witnesses and in denying his motion for retrial. He also argue[d] that his sentences must be vacated for three reasons: (1) that the district court erred in granting the government's motion to  resentence him pursuant to Federal Rule of Criminal Procedure 35(c) because the government waived any objection to the original sentence by not objecting after the court pronounced

---

[4]On January 15, 1998, the court granted Hill's motion for *in forma pauperis* status on appeal in order to  obtain a transcript without cost. (Doc.286).

sentence; (2) that the district court violated the Double Jeopardy Clause and Rule 35(c) when it resentenced him to a longer term of incarceration; and, (3) that the district court erred in holding him responsible for between 50 to 150 grams of cocaine base.

In a *per curiam* opinion, the U.S. Court of Appeals for the Eleventh Circuit reported "no merit to any of the arguments made by Hill" and, accordingly, affirmed his convictions and sentences. The appellate court issued the Judgment as mandate on April 29, 1999 (Doc. 326), and on October 7, 1999, the United States Supreme Court denied certiorari review (Docs. 368 – 369). *United States v. Hill*, 176 F.3d 492 (11ᵗʰ Cir. Mar. 5, 1999) (TABLE), *cert. denied*, 528 U.S. 918 (1999).

### C.   Section 2255 Proceedings

On April 19, 2000, Hill moved *pro se* to vacate his sentence under 28 U.S.C. § 2255, specifying eight reasons: (1) gross ineffective assistance of counsel; (2) a constitutionally flawed Indictment; (3) perjured testimony; (4) "that [he] could not have been held responsible for the amount of drugs attributed to him"; (5) denial of constitutional right to a speedy trial; (6) " that the trial court had the authority to impose a lighter sentence under 5K2.1"; (7) prejudicial closing remarks by the prosecutor; and (8) "that there was never a differentiation between crack and powder cocaine at [his] trial and sentencing." (Doc. 375 at 2-3).

The United States' response included supporting affidavits from Hill's trial counsel as

well as his sentencing counsel.[5]  Although Hill filed a reply on June 29, 2000 (Doc. 382), the court extended to August 20, 2000, an opportunity to address the government's specific contentions  (a) that claims which could have been but were not raised at trial or on direct appeal are procedurally defaulted; (b) that claims addressed and decided adversely on direct appeal are barred; and ( c ) that ineffective assistance of counsel claims are without merit and do not establish cause for his procedural default. (Doc. 383).

On August 8, 2000, Hill filed a *Motion for Relief from Judgment Pursuant to F.R.C.P. 60(b)(6),* asserting new case law, *Apprendi v. New Jersey*, 530 U.S. 466 (2000), "as grounds for why his sentence must be overturned and either release him because of an erroneous sentence that went outside the scope of the indictment and the federal statutes ranges, or, at the very least, resentence [him] to the lower sentence of 41 months." (Doc. 384). The court granted Hill's motion to consolidate this Rule 60(b)(6) motion and his § 2255 motion (Doc. 395, Oct. 31, 2000).[6]

---

[5](Doc. 381). The affidavits of counsel reflected compliance with the court's order pursuant to its finding that Hill waived the attorney-client privilege by asserting ineffectiveness of counsel. (Doc. 378).

[6]The motion makes clear that the issue raised in the Rule 60(b)(6) motion is not materially different from Hill's complaints in his 2255 motion about his sentencing:

> Hill presents an important constitutional issue in his Rule 60(b)(6) that, if reviewed, Hill believes it will reduce his sentence by more than half.  This issue, which addresses the *Apprendi* case that was recently decided by the United States Supreme Court proves that Hill should have been sentenced to a term that is less than 120 months. The imposition of the 120 month sentence violated Hill's Fifth, Sixth and Eighth Amendment rights.

(continued...)

Hill also responded to the United States' specific contentions, including its arguments for procedural default of his claims. (Doc. 385, Aug. 18, 2000).  Magistrate Judge Carroll determined that the submissions warranted an evidentiary hearing,  duly appointed counsel for Hill – Paul Cooper – and provided instructions for the pre-trial order.[7]    A p p o i n t e d counsel filed for Hill an amended §2255 petition on November 17, 2000, in which he specified three  additional  grounds of relief:

> 1.   trial counsel's ineffectiveness in not calling as witnesses defendant Hill;  Charles LNU, the manager of Doby's Motel;  Cassandra Morgan, friend of Defendant; and Myron Williams, co-defendant who was dismissed in during the trial;

> 2.   denial of Defendant's right under the Fifth Amendment to the United States Constitution to testify in his own behalf;

> 3.   Defendant's sentence was unconstitutional. He alleges a violation of his Notice and Jury Trial guarantees under Sixth Amendment: (1) to have notice in the indictment of the amount of drugs with which he was charged, (2) to have an individualized verdict returned by the jury on that particular amount of drugs, and (3) to have a verdict based upon proof beyond a reasonable doubt of that particular amount of drugs with which he was convicted. The quantity of drugs must be alleged in the indictment, submitted to the jury in the verdict form, and proven beyond a reasonable doubt before he can be sentenced to anything other than under the "catch-all" sentence pursuant to 21 U.S.C. 841(b)(1)(C). *See Apprendi v. New Jersey*, 120 S.Ct.2348 (2000).

(Doc. 397).

Pursuant to the parties' Pretrial Order filed December 3, 2000 (Doc. 403), Magistrate Judge Carroll conducted an evidentiary hearing on February 2, 2001, took under advisement

---

[6](...continued)
*Motion to Consolidate Rule 60(b)(6) with 2255 Motion* (Doc. 395, Oct. 30, 2000).

[7](Doc. 391, Aug. 25, 2000).  Initially appointed counsel, William R. Blanchard, moved for relief from his appointment, triggering Cooper's appointment on September 28, 2000. (Doc. 391).

the testimonial and documentary evidence, including the trial transcript, and all written submissions, and provided an opportunity for post-hearing submissions on the *Apprendi* issue.[8] Upon reassignment of this case for recommendation on the pending motions, the undersigned Magistrate Judge necessarily has examined the trial transcript and the entire record.

## II.  ISSUES

The parties received notice by the scheduling order entered on August 25, 2000, that their pretrial order, "if approved, [would] be entered by the court as its order and the parties will be bound by the representations made in the order, particularly with regard to the issues presented." (Doc. 386).  On December 5, 2000, the court approved the Pretrial Order – signed and submitted by counsel for Hill and for the United States – in which Hill states three issues, as follows:

A.  Hill alleges *ineffective assistance of counsel by his trial counsel because he failed to call the following witnesses*: The Defendant, Juanisse Hill;  Charles LNU, the manager of Doby's Motel in Montgomery, Alabama;  Cassandra Morgan, friend of Defendant; the occupants of Room 304 of the Capital Inn on December 4, 1996; and  Myron Williams, co-defendant.

B.  Defendant alleges that he was *denied his right under the Fifth and Sixth Amendments to the United States Constitution to testify in his own behalf;*

C.   Defendant alleges that he was sentenced in violaion of his Due Process Right under the Fifth Amendment and his Notice and Jury Trial guarantees under Sixth Amendment:  (1) to have notice in the indictment of the amount of drugs with which he was charged, (2) to have an individualized verdict returned by the jury on that

---

[8](Doc. 413); Transcript of Evidentiary Hearing, filed June 14, 2001 ("Hr'g Tr.") at 99-100 (Doc. 415).

particular amount of drugs, and (3) to have a verdict based upon proof beyond a reasonable doubt of that particular amount of drugs with which he was convicted. The quantity of drugs must be alleged in the indictment, submitted to the jury in the verdict form, and proven beyond a reasonable doubt before he can be sentenced to anything other than under the "catch-all" sentence pursuant to 21 U.S.C. 841(b)(1)(C). *Apprendi v. New Jersey*, 120 S.Ct.2348 (2000); *United States v. Rogers*, __F.3rd__, No. 99-15150, 2000 WL 1451907 (11th Cir. Sept. 29, 2000); and *United States v. Wallace Salery*, __F. Supp.__, (MD Ala. Nov. 9, 2000), Judge Albritton, CR-00-16-N.

The issue of the length of his sentence being incorrect was raised on direct appeal at his re-sentence and on direct appeal.

(Doc. 403 at 1-2).

The United States concedes that "the issue of ineffective assistance of counsel is not procedurally barred"[9] but contends as to the remaining claims:

The issue of the violation of the Fifth Amendment Right to Testify was not raised at trial or appeal and is procedurally barred. *In re: Joshua*, 224 F.3rd 1281 (11th Cir. Aug. 30, 2000) held that so far as a second or successive petition for collateral relief, the 11th Circuit will not recognize whether or not *Apprend*i applies retroactively until the United States Supreme Court speaks to the issue.

(*Id.* at 3).

The discussion which follows first addresses the procedural default claimed on the *Apprendi* issue *and* next examines the merit of Hill's ineffective assistance of counsel claims, including the claim grounded on his right to testify.[10]

─────────────────────

[9]A claim of ineffective assistance of counsel constitutes sufficient cause to escape the procedural bar which would otherwise block § 2255 claims not raised on direct appeal. *Greene v. U.S.,* 880 F.2d 1299 (11th Cir.1989).

[10]The United States contends that "[t]he issue of the violation of the Fifth Amendment Right to Testify was not raised at trial or appeal and is procedurally barred." Maintaining that the issue "is interwoven with the ineffective counsel issue," Hill argues:

(continued...)

# III.  DISCUSSION

## A.  Apprendi Claims

### 1.  Standard of Review: Procedural Default

As explained to Hill even before he received counsel to represent him in advancing his 2255 claims at the evidentiary hearing, a "procedural default" bars consideration of the merits of a claim unless the defendant "can show cause excusing his failure to raise the issues previously and actual prejudice resulting from the errors." *Cross v. United States*, 893 F.2d 1287, 1289  (11th Cir. 1990); *see also Greene v. United States*, 880 F.2d 1299, 1305 (11th Cir. 1989).  However, even if the defendant fails to show cause and prejudice, a procedural default will not preclude a federal court from considering a federal constitutional claim where the movant is able to show that the court's failure to address his claim would result in a "fundamental miscarriage of justice."  *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

### 2.  "Procedural Default" Analysis  –  *Apprendi* claim

Citing *Teague v. Lane*, 489 U.S. 289 (1989), Hill seeks the  retroactive application of *Apprendi* as  an "issue of fundamental fairness involving a new 'watershed' rule of criminal

---

[10](...continued)
It was ineffective assistance of counsel not to bring this issue up on appeal.  Petitioner and his appellate counsel did not communicate well with Hill or his mother.  His appellate counsel tried to withdraw as his attorney because Hill wanted to communicate with her about the brief.  Because of the lack of communication, the Right to Testify issue and Ineffective assistance of trial counsel issues were not raised on appeal.

(*Pretrial Order*, Doc. 403 at 3-4).

procedure in the application of the sentencing guidelines to a conviction." (*Pretrial Order*, Doc. 403 at 2). Because the indictment did not specify any quantity of drugs, he claims that the court "illegally" sentenced him in 1997 based squarely on the quantity of cocaine attributed to his possession:

> After a trial by jury Hill was the only one found guilty since the major players had pled guilty (or were either staging mental paranoia), and then testified against a non-player, Juannise Hill. The jury never made a determination as to the amount of drugs involved in Hill's case nor could they have since no amount was listed in Hill's indictment. . . AUSA Steven M. Reynolds, . . . presented drug amounts to the Honorable Truman Hobbs that went well outside the scope of Hill's indictment thereby enhancing Hill's sentence far beyond the maximum allowable of 41-51 months.[11]

In sole reliance on the 2000 decision by the Supreme Court in *Apprendi*, Hill argues that his sentencing deprived him of constitutional rights (1) to have notice in the indictment of the amount of drugs with which he was charged, (2) to have an individualized verdict returned by the jury on that particular amount of drugs, and (3) to have a verdict based upon proof beyond a

---

[11]*Motion for Relief from Judgment Pursuant to F.R.C.P. Rule 60(b)(6),* Doc. 384 ("Rule 60(b)(6) Motion") at 3. In his original 2255 petition, filed *pro se* prior to *Apprendi*, Hill articulated a different argument for the illegality of his sentence:

> Hill is not arguing that an amount of drugs should have been alleged in the indictment, he argues that the Fifth Amendment of the Constitution mandates that he be made aware in the indictment of the nature of any penalty if indicted for an "infamous crime." A jury was instructed to find Hill guilty of an "infamous crime" but Hill was, in fact, indicted for something "unlawful" with no penalty implied.

(*citations omitted*, *2255 Motion* , Doc. 375) at 10. It appears that counsel abandoned this contention, focusing instead on *Apprendi*, and the court declines to address it  because it is both patently procedurally defaulted, having not been raised at trial or on appeal, and patently meritless , as no federal statute, rule, or caselaw requires the indictment to specify the penalty specified in the charging statute.

reasonable doubt of that particular amount of drugs with which he was convicted.[12]

"Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi* , 530 U.S. at 490.   If *Apprendi* properly applied to Hill's case, unquestionably he would have been entitled to the three rights specified and their deprivation would be remediable in this court.[13]   The unfortunate reality for Hill is that this court is restrained by the controlling rule of non-retroactivity which deprives Hill of any benefit from *Apprendi.*

*McCoy v. United States*, 266 F.3d 1245 (11th Cir. 2001), " held that *Apprendi* errors are not jurisdictional, and also held that under the doctrine of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)[14], the *Apprendi* decision is not retroactively applicable

---

[12]At the conclusion of the evidentiary hearing on February 2, 2001, the court acknowledged the United States' request to submit supplemental authority from the Eleventh Circuit on the *Apprendi* issue, and noting his familiarity with the case cited, also invited any response from Hill's counsel, adding: "And Mr. Cooper, if you ...want to file something in response you can.  I mean the problem with the *Apprendi* issue is that it's procedurally defaulted."   Though Counsel responded, "That's an issue right there" (*Hr'g Tr.*  at 99-100), the records reflects no supplemental submissions by either counsel on this issue.

[13]At the time of Hill's trial, he had no statutory basis for his claims because drug quantity was *not* considered an element of an offense under 28 U.S.C. § 841(a)(1) or 28 U.S.C. § 846.  In order to convict Hill  under either statute,  the government had to prove beyond a reasonable doubt only that *some* controlled substance was involved.  *See, e.g., United States v. Mejia*, 97 F.3d 1391, 1392-93 (11th Cir. 1996). Thus, the quantity of drugs underlying the offense was a sentencing issue properly reserved for determination by Hill's trial judge.

[14] *Teague* holds generally that few constitutional arguments apply retroactively on collateral attack even if properly preserved. The Supreme Court held specifically that new constitutional rules
(continued...)

to cases in which the [challenged] conviction became final before the *Apprendi* decision was released on June 29, 2000." *Hamm v. United States*, 269 F.3d 1247, 1249 (11th Cir. 2001). *See also Kaufmann v. United States*, 282 F.3d 1336, 1337 (11th Cir. 2002). "The effect of *McCoy's* holding that *Apprendi* is not retroactively applicable to cases on collateral review ... is to bar all *Apprendi* claims in such cases whether or not [the claims] are meritorious." *Hamm*, 269 F.3d at 1250.

The Judgment filed November 18, 1997 on Hill's conviction and sentence became final on October 7, 1999, the date of the Supreme Court's denial of certiorari review from the Eleventh Circuit Court of Appeal's March 5, 1999 affirmance of that judgment.[15] While Hill

---

[14](...continued)
of criminal procedure are not applicable to cases which have become final before the new rules are announced unless they fall within one of two narrow exceptions to this general rule. *Teague,* 489 U.S. at 305. *Apprendi*, considered a "new rule" of criminal procedure when decided in 2000 – would not be applicable to Hill's conviction – made final in 1999 and now pending before the court on collateral review – unless it falls within an exception. The first exception recognized by the *Teague* Court allows a new rule to be applied retroactively if it places certain conduct beyond the power of criminal law-making authority. *Id.,* at 311. This exception is not relevant here because the rule in *Apprendi*, which requires specific quantities of controlled substances to be stated in the indictment, does not place the conduct of possessing or distributing these specific quantities beyond the power of criminal law-making authority. The second exception, "reserved for watershed rules of criminal procedure", applies only to "those new procedures without which the likelihood of an accurate conviction is seriously diminished." *Id.,* at 313. Hill's counsel in this proceeding places the *Apprendi* rule within this exception but provides no case law precedent or other supporting authority. Indeed, in *McCoy,* 266 F.3d at 1258, the Eleventh Circuit held that "the new rule announced by the Supreme Court in *Apprendi* does not fall within either exception to *Teague's* non-retroactivity standard."

[15]*See Washington v. United States*, 243 F.3d 1299, 1300-1301 (11th Cir. 2001) (per curiam) (for convicted defendant who files a petition for certiorari, the conviction is final for purposes of 28 U.S.C.§ 2255 on the day that the Supreme Court denies a convicted defendant's certiorari petition (continued...)

can establish "cause" for not raising this issue previously in that *Apprendi* had not been decided, the firmly established non-retroactivity of the *Apprendi* rule means, in effect, that he cannot demonstrate either actual prejudice or a fundamental miscarriage of justice. Because he cannot now attack collaterally his 1999 conviction on the basis of constitutional rights announced in the 2000 *Apprendi* decision, Hill  is not entitled to any relief on the *Apprendi* claims asserted in his consolidated §2255 and Rule 60(b) motions.

### B.    Ineffective Assistance of Counsel

#### 1.    *Standard of Review*

The Sixth Amendment right to counsel exists to protect the fundamental right to a fair trial.  To prevail on a claim of ineffective assistance of counsel, a movant must satisfy both prongs of the test articulated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984).  The performance prong requires a movant to establish that counsel performed outside the wide range of reasonable professional assistance and made errors so serious that he failed to function as the kind of counsel guaranteed by the Sixth Amendment.  *Id*. at 687-89.  The prejudice prong requires a movant to demonstrate that seriously deficient performance of his counsel prejudiced the defense.  *Id*. at 687.

---

[15](...continued)
or renders a decision on the merits) and *Kaufmann v United States*, 282 F.3d 1336, 1338 (11th Cir. 2002) (for convicted defendant who does not file a petition for certiorari, the conviction becomes final upon the expiration of the 90-day period for seeking certiorari).

There is a strong presumption that counsel's performance was reasonable and adequate, and great deference is shown to choices dictated by reasonable trial strategy. *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994); *see Strickland*, 466 U.S. at 689.  Review of an ineffective assistance of counsel claim is conducted from the perspective of defense counsel, based on facts "as they were known to counsel *at the time of the representation*."  *United States v. Teague*, 953 F.2d 1525, 1535 (11th Cir. 1992) (emphasis in original); *see Strickland*, 466 U.S. at 689-90.

The prejudice component of the *Strickland* test focuses on whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. *See Strickland*, 466 U.S. at 687.  To establish prejudice, a movant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Unless a movant satisfies both prongs of the *Strickland* inquiry, relief should be denied. *Strickland*, 466 U.S. at 687.  Accordingly, a court need not "address both components of the inquiry if the [movant] makes an insufficient showing on one." *Id.* at 697. *See, e.g., Duren v. Hopper*, 161 F.3d 655, 660 (11th Cir. 1998) ("if a defendant cannot satisfy the prejudice prong, the court need not address the performance prong").

A criminal defendant's right to effective assistance of counsel continues through direct appeal.  *See Evitts v. Lucey*, 469 U.S. 387, 396 (1985).  Ineffective assistance of appellate

counsel may be shown if the movant can "establish ... that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker....  Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Mayo v. Henderson*, 13 F.3d 528, 533 (2nd Cir. 1994).

### 2.   Failure to call Defendant to testify

#### ( i ) Standard of review

The court's evaluation of Hill's "right to testify" claim is governed by these standards stated succinctly in *Gallego v. United States*, 174 F.3d 1196, 1197 (11th Cir. 1999):

> A claim of ineffective assistance of counsel is the proper framework to analyze defendant's allegation that his attorney has violated his right to testify.  *See United States v. Teague*, 953 F.2d 1525, 1534 (11th Cir. 1992) (*en banc*).  A criminal defendant has a "fundamental constitutional right to testify in his or her own behalf at trial.  This right is personal to the defendant and cannot be waived either by the trial court or by defense counsel." *Teague*, 953 F.2d at 1532.  Where counsel has refused to accept the defendant's decision to testify and refused to call him to the stand, or where defense counsel never informed the defendant of his right to testify and that the final decision belongs to the defendant alone, defense counsel "has not acted 'within the range of competence demanded of attorney's in criminal cases,' and the defendant clearly has not received reasonably effective assistance of counsel." *Teague*, 953 F.2d at 1534 (citing *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052).

#### ( ii )   Evidentiary Analysis

Because only the amended 2255 petition filed by appointed counsel for Hill specifies trial counsel's failure to have him testify as ineffective assistance, the affidavit submitted by trial counsel with the United States' response to Hill's original 2255 petition does not

16

reference this issue at all.  At the evidentiary hearing warranted to uncover the material facts

underlying the claim, both Hill and Atty. Focke gave probative testimony.

Hill's relevant testimony  on direct examination proceeded as follows:

Q:  What did Mr. Focke tell you about your right to testify?

A:  He told me he couldn't tell me not to testify, he said because it is my right to testify.  And he was telling me that he don't think it's in my best interest to testify.  But I was telling him, I told him that I wanted to let the jury know how it came about for me to be at the scene of the crime.  So he told me if I didn't testify he would let the jury know how it came about for me to be at the scene of the crime.  And since he's going to let the jury know there really is no reason for me to testify.

Q:  Why did you think it would be critical to get that point across to the jury?

A:  Because without me letting the jury know how it came about for me to be at the scene of the crime then the evidence does look like I was there for the purpose of a drug ordeal or whatever.

   THE COURT:   Your testimony though I think, Mr. Hill, is that Mr. Focke made it clear it was your decision whether or not to testify?

   THE DEFENDANT:   Yes, he did.

Q:   If you decided – what was your understanding that if you decided not to testify what Mr. Focke was going to argue to the jury?

A:  He said he would let the jury know that Ms. Hurston asked me for a ride and that was my purpose for being there, but he never did.

Q:   Okay.  So as I understand your agreement you agreed not to testify and he followed your instructions in regard to that argument.

A:   Well, later we went into the Judge's chambers and we had a discussion with the Judge about it.  And he told the Judge about me not wanting to testify, but I told the Judge that I never said I didn't want to testify, I agreed that if he let the jury know how it came about for me to be at the scene of the crime then I had no reason to testify.  But if he didn't, then yes, I do want to testify.

Q:  Okay.  Now, was that on the record?

A.   No, that part was supposed to be on the record, it should have been on the record.

Q:   Now, did Mr. Focke make that argument to the jury pursuant to your instructions?

A:   To the jury?

Q:   Yes.

A.   No.

(Hr'g Tr. at 43-45).   Under cross-examination Hill reaffirmed that trial counsel advised him of his right and decision to testify.  (*Id.* at 53.)

Trial counsel's  pertinent recollections on this issue confirmed Hill's report of his advice regarding the  decision to testify and also documented the considerations underlying his recommendation that Hill not testify:

> I think I advised Mr. Hill that in a trial of a case that basically the only decision that he got really to make was whether or not he wanted to plead guilty or not testify, that all other decisions as to witnesses and whatever was up to the attorney, and if things turned out bad that he had an avenue down the road which is a 2255 which is where we are today.  We had discussions about that.
>
> There was many discussions, quite honestly I went back and forth in my own mind about whether or not it would be my recommendation that Mr. Hill testify.

(Hr'g Tr.  at 86)

> After Ms. Freeman's practice cross-examination on Mr. Hill it became obvious to both Ms. Freeman and myself that in our professional judgment Mr. Hill did not come across as being truthful.  And in a case as close as this we thought that could be – if he testified that that  could be the final nail in the coffin. And that was the basis of my recommendation that he not testify.

18

(Hr'g Tr. at 88).

Following the examination by counsel, the court also engaged Atty Focke on this issue:

THE COURT:    Mr. Focke, there's this discussion about the question of whether or not Mr. Hill should testify   Would you tell me as much as you can recall about the discussions you had with him about his own testimony?

[Atty. Focke]:   We discussed on more than one occasion his right to testify and the fact that he might – it might be in his best interest to testify. Somewhere in my file, and if the clerk will give me a minute I can find it, some practice questions actually that --

THE COURT:   I am more concerned about how you discussed the allocation of responsibility for deciding who testified with him.

[Atty. Focke]:   Okay.  At all times I advised him that that was his decision to make.  He would ask what my recommendation would be, and I went hot and cold on that.  As the case was developing before trial even up unto and during trial I remember sitting down on the first floor, the trial was held in the – I believe the fourth floor courtroom.   I remember during breaks in the trial sitting down on I believe it was the first floor, those benches as you go back towards Judge DeMent's office, sitting there talking with him about that he had the right to testify, that I went back and forth up unto the conclusion of the government's case about whether or not in my opinion I thought it would be a good idea or not, but ultimately, you know, it had to be his decision.

THE COURT:   At some point you conducted a mock direct and cross of Mr. Hill; is that right?

[Atty Focke]:   Yes.

THE COURT: With Ms. Freeman doing the cross?

[Atty. Focke]: Yes.  And I do believe that we talked – when Mr. Hill brought to my attention he was dissatisfied with how I was doing in the trial, if memory serves me, we went in front of Judge Hobbs in camera and I laid this all out in front of Judge Hobbs, the concerns that Mr. Hill was having with me; you know, his right to testify and whatever.  And I believe Judge Hobbs – I believe

Judge Hobbs probably at that time also advised him it was his right to testify, but you know, he should consider advice of counsel.

(Hr'g Tr. at 95-97).

Atty. Focke could neither admit nor deny Hill's testimony that he declined to testify in reliance on counsel's agreement to make clear to the jury his reason for being at the crime scene:

> Q:    One last question, do you remember anything about what Mr. Hill said to you about what he wanted you to include in your final argument, if he did?
>
> A:    I generally give clients – I don't recall in this case, but normally I give them either a legal pad or a couple of pieces of paper to write notes down.  He might very well have made a suggestion or two.  I have a vague, very vague recollection . . . that he wrote something down, at least one or two things down on a piece of paper during ... the closing arguments.  I have a vague recollection that I went and glanced at what he had written.  I don't recall if I included that in the closing arguments or not.  If he says he did, I have no reason to – that he wrote it out I have no reason to dispute it.  But again, closing argument is something that I do and not the client.

(Hr'g Tr. at 98-99).

The relevant testimony is undisputed that trial counsel clearly advised Hill, and Hill clearly understood, that he retained the ultimate right to choose whether or not to testify; both recall that the trial judge independently advised Hill of this right.  The court cannot readily decide from this record whether or not Hill exercised that choice based on an understanding from counsel that counsel would communicate to the jury Hill's innocent reason for being at the crime scene.   What can be determined is that trial counsel deliberated extensively on the issue, discussing it with counsel who assisted in Hill's mock

20

cross-examination, and explained to Hill why he believed it not to be in his best interest to

testify.

Scrutiny of counsel's closing arguments also compels the conclusion that trial counsel

communicated to the jury substantially what Hill requested – an explanation for his

appearance at the crime scene:

> I told you in opening statement that not one police officer would be able to say
> that they ever saw that young man involved in any way with drugs.  And I
> asked every police officer and they all acknowledged that they had no personal
> knowledge, they had never seen him do anything illegal.  This case comes
> down to Terri Herston and Betty Knight.
> ***
> Time out.  You say.  "Time out, Mr. Focke.  Wait a minute here.  Wait a
> minute.  Time out.  That all sound good, but what was he doing there? Now if
> he wasn't involved in this dope deal, what was he doing there?"
>
> A lot of reasons of why he might be there besides a dope deal.  The government
> has the burden of proving to you beyond a reasonable doubt that he was there
> for a dope deal.  It is is not enough if it is he was probably there for a dope deal.
> Clear and convincing evidence.  That is not enough.  It has to be beyond a
> reasonable doubt.
>
> I would suggest, have you ever taken a ride with a friend?  Somebody comes
> and knocks on your door and says, "Hey.  Do you want to go with me; just hang
> out with me?"  And you go along.
>
> Remember who was driving.  Remember who knew where to go.  In that
> December the 4th statement, look at her description of Haywood Norman's
> house.  You darn right she got these drugs off the street from Haywood
> Norman's house because she knew that that is from whom you get drugs.  She
> knew.
>
> Isn't it interesting that the only two people, when they were arrested, that had
> drugs on them were Betty Knight and Terri Herston?  This young man had no
> drugs on him.  There were no drugs in his car.  None whatsoever.

I mentioned to you in opening statement, and I believe the evidence shows you, that Juannise hung out with some bad people, with the wrong people. And he was in the wrong place and he was there at the wrong time. That does not make him guilty. That fact that he was ... His mere presence at the scene of a crime does not make him guilty. Poor judgment does not make him guilty.

(Trial Tr., vol. 2, 115; 118-119).

In sum, the court finds no evidence that trial counsel refused to accept a firmly communicated decision by the defendant to testify and refused to call him to the stand. The court cannot conclude that trial counsel's performance "fell below an objective standard of reasonableness" after evaluating carefully the record of his performance on the issue of advising the defendant clearly on his right to testify, deliberating meaningfully to gauge the merits of recommending that he not do so, and proceeding to advance vigorously the best arguments for the defendant's innocence in his closing argument. Because Hill has not established the threshold test of *Strickland v. Washington*, he is not entitled to any relief on the claim that he was denied his right to testify.

### 3. *Failure to Call Other Witnesses*

#### (i) *Charles LNU, the manager of Doby's Motel*

Hill wanted the manager of Doby's Motel, known to him as Charles, as a trial witness because "we had a conversation about Ms. Hurston once and he told me that he didn't know if I knew this, but Ms. Hurston was a prostitute. And he said when I go to work at night Ms. Hurston has a lot of traffic in and out of that hotel room. And he said she is only

manipulating me for a place to stay." As to why he deemed the manager's testimony "critical to [his] case," Hill responded: "[b]ecause after then he never did see her there any more." (Hr'g Tr. at 28-29).

Trial counsel did not subpoena the motel manager because he did not consider him a critical witness. The trial transcript discloses that the fact of Hurston's prostitution was communicated at trial through other evidence, and even Hill's trial counsel referenced it during closing argument.[16]   Accordingly, his failure to call the motel manager cannot be properly characterized as either incompetent performance or a failure prejudicial for Hill's defense.

### (ii)   *Cassandra Morgan, friend of Defendant*

Hill communicated to trial counsel his belief in Cassandra Morgan as a "key witness" and acknowledged counsel's disagreement and refusal to call her, a decision explained as follows by Atty. Focke:

> My recollection again is Mr. Hill's story to me was that when he left the motel with Ms. Hurston that she dropped him off at this lady's [Cassandra Morgan's] apartment or house, that was around the corner or around the curve from where Mr. Norman [co-defendant Haywood Norman] lived. . . . supposedly Ms. Hurston went on and came back later and picked him up about 15 minutes later. When Mr. Carmichael [Federal Defender investigator] questioned her her story did not match up with Mr. Hill's. Her testimony was that Mr. Hill had only come in the house for two or three minutes to make a quick phone all

---

[16]Focke argued, for example: "I suggest that you don't dance with Terri Herston and Betty Knight.  I suggest that you don't compromise with them.  Because it would be wrong to convict Juannise or anybody on the words of those two prostitutes.  They are self-seeking, self-promoting, self-protecting people who have lied to their families, lied to their friends, lied to the police, and, I submit, lied from the witness stand."  (Trial Tr.,vol. 2, 114-115).

and Ms. Hurston remained outside in the vehicle and had not driven away until he had come back out. And so her testimony conflicted with his version of the story. And also would not have been helpful to the defense, it was just a stop on the way to pick up the drugs.[17]

Summoned as a witness for Hill at the evidentiary hearing, Cassandra Morgan's testimony illustrates the wisdom of trial counsel's assessment of Morgan as "not a key witness" despite Hill's contrary, lay opinion.   She denied any communications with Atty. Focke or his investigator prior to the day of trial, when she appeared voluntarily, spoke with Focke for the first time, and complied with the attorney's request to stay around in case he needed to summon her as a witness.  Morgan described herself as Hill's girlfriend since 1995, placed her residence on December 4, 1996, "around the corner...about 20 houses down...about a block" from Haywood Norman's house, and described Terri Hurston as a prostitute who "used to hang around" at the Doby's Motel which then served as Hill's residence.  Regarding her personal encounter with Hill , she testified that he arrived at her house in his car with Terri Hurston driving, around 3:30 or 4:00 on the afternoon of the crime date:

> He came and got some money from me.  Said that Ms. Hurston knew a lady that was selling clothes, name brand clothes at half price.  And I had told him . . . what I wanted if she had it, you know, to get that for me.  So he came by and got the money from me and I was basically telling him what I wanted. . . I didn't walk to the car.  I stayed on the porch.  And she waved, I spoke, and he was coming up the driveway as she was speaking.  And by the time he got on the porch I opened the front door and we were just standing there talking, just chitchatting and she drove on off.

---

[17]Hr'g Tr. at 33, 85.

24

Morgan testified to giving Hill "about a hundred, hundred and 20" dollars before he left after "about five, no more than ten minutes" inside her living room; when Hurston pulled back up in the car to get him, Hill did not tell her where he was going but she assumed they were headed to get the clothes. [18]

Hill's testimony at the evidentiary hearing differed in material respects from Morgan's and thereby lending some credence to trial counsel's recollection that Morgan's communications to his private investigator disclosed the same material variances.  Hill testified (a) that he drove his car to Morgan's house while Morgan said she saw Hurston driving, and (b) that he parked the car in front of her house on the street and left Hurston sitting inside on the passenger side while he went inside. [19]  On a point deemed critical by Hill – whether he used the phone while at her house – Morgan did confirm that he neither received nor made any calls.[20]  Given the significant differences in their versions of their encounter, however, trial counsel would have acted reasonably in concluding that Morgan's testimony would not be of substantial value to Hill's defense.

### (iii)  The occupants of Room 304 of the Capitol Inn on 12/4/1996

-----------------------------------

[18]Hr'g Tr. at 54-60.

[19]Hr'g Tr. at 16: 21-22; 18: 16-22, 20: 12-15.

[20]Hill explained the importance of this fact: "...she could have testified that I never used a phone in her house. . .  Terri Hurston said that I went to Cassandra Morgan's house to say that I couldn't get the drugs, that I didn't get the drugs, and Betty Knight said that I did use the phone saying that I got the drugs. . .She [Betty Knight] said I called her at that time and said that I had the drugs."  (Hr'g Tr. at 27).

Hill was arrested in Room 305 of the Capitol Inn, and the government's evidence at trial indicated that drugs were being sold there and in the adjacent Room 304.   At the evidentiary hearing Hill identified Room 304 occupants as "some people selling clothes", a man and a woman  whose names he did not know, and he acknowledged offering to buy from them "some Tommy Hilfiger outfits [that] they were supposed to be going to steal."   During his conversation with these vendors, a guy named Warren – known to Hill and seen initially by Hill with Betty Knight in room 305 – was inside the room and Terri Hurston came over later.  (Hr'g Tr.  at 12-13).

The evidentiary hearing did not produce any testimony regarding these witnesses and the court has not been provided any other factual foundation for assessing Hill's claim that trial counsel acted incompetently by failing to call these unnamed witnesses.

### (iv)   *Myron Williams, co-defendant*

Trial counsel did not comply with Hill's request to subpoena as his witness Myron Williams, who was arrested along with Hill at the crime scene and indicted with him.   Hill told his lawyer that Williams "could attest to us having a conversation and him asking me why was I at Capital Inn.  And me telling him that the only reason why I was there that Hurston asked me for a ride."   According to Hill, trial counsel responded as follows:

> A:   He went and talked to him and came back and told me that Myron Williams did say that he remembered having a conversation with me, and he said Myron Williams did say the only reason why I was there was Ms. Hurstson asked me for a ride.

> Q:  Well, what was your understanding about what Mr. Focke was going to do

26

with regard to Myron Williams?

A:  He said he would call him to the stand.  But right before he said he got a chance to call him to the stand he said Myron Williams' attorney came and told him that Myron Williams said he was drunk during the whole time. He said he remembered having a conversation with me but he doesn't remember anything else because he was drunk.

Q:  What did you tell Focke to do at that point?

A:  I still wanted him to come to the stand.  I at least wanted the jury to know that – why I was there.

(Hr'g Tr. at 31-33).

Atty. Focke's testimony at the evidentiary hearing confirmed his inability to summon this co-defendant as a witness on his lawyer's instructions after succeeding in reaching a plea agreement:

I think it was a noon recess that the government came to terms on a plea agreement with Ms. Knight. . . .  But I think it was at the end of the day or I think it might have been the next morning when Mr. Williams' name wasn't there that we first found that he wasn't – that he had also been dismissed against and we were advised that he wasn't going to be a witness.  And I believe I sent Mr. Carmichael [an investigator for the Federal Defender] out to try and find him.  I just recall that we didn't learn anything that would be favorable to us.

(Hrg. TR, at 83-84)

Under these circumstances, trial counsel's failure to call Myron Williams as a witness hardly approaches the border of performance outside the wide range of reasonable professional assistance.   It is well settled that a defendant has a constitutional right not to testify.  *See, e.g., Bourjaily v. United States*, 483 U.S. 171, 182 (1987); *Lee v. Illinois*, 476 U.S.

530, 550 (1986); *Turner v. United States*, 396 U.S. 398, 432-33 (1970).  Having been put on notice by counsel for  co-defendant Williams that he would not testify following a plea agreement which dismissed him from the case, an attempt to subpoena him anyway  by Hill's trial counsel –  who indisputably did plan to call him as a witness – would have been futile. Hill therefore cannot demonstrate by this claimed error  either his lawyer's incompetent performance or any prejudice as a result of trial counsel's failure to call co-defendant Williams as a defense witness.

### (v)   Summary Analysis:  failure to call witnesses

Regarding his disagreement with Hill on critical witnesses who should be summoned, Atty. Focke advised Hill properly that such decisions ultimately rested with the attorney in contrast to the defendant's ultimate decisions about his own testimony.[21]  Upon evaluation, the court discerns no basis for attributing to trial counsel's tactical decisions in this regard the imprimatur of constitutionally deficient performance by counsel.  *See United States v. Costa*, 691 F.2d 1358 (11th Cir. 1982); *United States v. Guerra*, 628 F.2d 410, 413 (5th Cir. 1980),

---

[21]The court has also examined the record in response to Hill's hearing testimony regarding trial counsel's failure to summon more than the three character witnesses called – his pastor, a school teacher, and his mother.  See Hr'g Tr. at 35.  His chief complaint is that "character witnesses from [his] neighborhood .. could have testified about [his] character around the neighborhood."  *Id*. at 52. Using such additional witnesses, Focke reasoned, could have backfired since Hill left his parents' home and neighborhood following a disagreement in 1996 and moved in with the wrong crowd.  *Id.*, at 79.  Nonetheless, Focke argued in closing the strength of the character testimony offered for Hill, contrasting his character with the unsavory character of the two prostitutes who served as primary witnesses against him..  See Trial Tr. at 119-120.

*cert. denied*, 450 U.S. 934 (1981) (allegations of ineffective assistance of counsel concerning uncalled witnesses impose a heavy showing since presentation of testimonial evidence is a matter of trial strategy). Moreover, the court deems it significant that trial counsel provided a reasonable opportunity for Hill to have him withdraw as trial counsel in light of their disagreement about witnesses who should testify.[22]

## IV.   CONCLUSION

Pursuant to the foregoing findings and conclusions of law, it is the **RECOMMENDATION of the Magistrate Judge that Hill's  28 U.S.C. § 2255 Motion, as amended (Docs. 375 and 397) and his Rule (60)(b)(6) Motion ( Doc. 384),  be DENIED**, as the claims asserted therein do not entitle him to relief.

It is further

---

[22]See Hr'g Tr. at 52-53, documenting Hill's admission that the trial court afforded him a chance to have different trial counsel, and Hr'g Tr. at 86-87, documenting trial counsel's recollection of this opportunity:

> We had an in camera conference with Judge Hobbs where I brought to Judge Hobbs' attention that there were some conflicts between Mr. Hill and myself on Mr. Hill's disagreeing with some of my recommendations. If I recall Judge Hobbs talked to him. Mr. King, who was in our office at that time, was co-chairing the case. Mr. King was prepared to take over and the Judge was willing to have Mr. King take over Mr. Hill's representation. . . Judge basically as I can recall did tell him that, you know, he had the right to testify but he didn't have the right to determine who else was going to testify. And, you know, left it up to Mr. Hill what he wanted to do. Mr. Hill ultimately decided he wanted me to continue as his counsel.

**ORDERED** that the parties shall file any objections to this Recommendation **on or before March 6, 2006.**

A party must specifically identify the findings in the Recommendation to which objection is made; frivolous, conclusive, or general objections will not be considered.

Failure to file written objections to the Magistrate Judge's proposed findings and recommendations shall bar a party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*).

Done this 17th day of February, 2006.

 

_____     /s/ Delores R. Boyd
                                                      DELORES R. BOYD
                                                      UNITED STATES MAGISTRATE JUDGE